All of you Washington National supporters, you're going to need this. We can win this. Trento, we'd be happy to hear from you. May it please the court, Andrea Trento from the Office of the Attorney General of Maryland on behalf of the defendant appellant in this case. In 2018, the Maryland General Assembly passed a law intended to modernize Maryland's political advertising disclosure laws. Can I ask you to speak up a little? I want to make sure I hear you. Yes, Your Honor. Maybe I'll speak into the microphone. That's much better. Intended to modernize Maryland's political advertising disclosure laws to reflect the changing commercial landscape of political advertising. It also did this against the backdrop of an unprecedented effort by foreign state related actors to influence the 2016 elections by a digital advertising and social media activity. The Online Electioneering Transparency and Accountability Act for the first time imposed disclosure and record keeping obligations on the online platforms that host political ads in Maryland. But it did so in a way that imposed only the most modest of additional burdens on the publishers of these online platforms. It did not impact in any meaningful way the editorial independence or control and did little more than align requirements for online platforms that host political ads with requirements that already apply to radio, TV, broadcast, cable, and satellite operators to do the same. Speaking of infiltration of social media, aren't we dealing here with Facebook or Twitter or various social media? Aren't we dealing with a fairly narrow as applied challenge to the application of the act to the particular defendants in this case? That's correct, Your Honor. They have brought it as a point. It's a pretty narrow question, isn't it? Well, the act certainly extends and applies to the Facebooks and the Twitters. I understand, but I thought that the issue before us here was to the district court's ruling, which as I understand it, was an as applied invalidation of the act to the particular defendants here. I thought that's all we were dealing with. That's correct, Your Honor. And Maryland's decision to extend the requirements, the disclosure obligations that are imposed in the act to online platforms that have at least 100,000 unique visitors per month, which capture a lot of the online platforms that are hosted or owned by the plaintiffs in this case, was a proper exercise of its legislative prerogative. The district court's conclusion that the act as applied to these plaintiffs likely violated the First Amendment's rights was an error, and a century of a preliminary injunction enjoining the enforcement of the act against the plaintiffs on that basis should be reversed. First, the court erred in disregarding decades of case law emanating from both the Supreme Court and this Court, subjecting campaign finance disclosure statutes to an intermediate level of scrutiny known as exacting scrutiny. Exacting scrutiny demands only a substantial relation between the disclosure requirement and a sufficiently important governmental interest. It also requires that the strength of the government's interest reflect the seriousness of the actual burden on First Amendment rights. The Court of Citizens United instilled the reason for this relaxation of scrutiny in this context. Quote, disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities. Thus, in Buckley, the Buckley v. Galeo case from the 70s, the court found that the substantial public interest in disclosure outweighed the risk that individuals would be deterred from contributing to candidates if their identities were disclosed. In Citizens United, the court held that disclosure was a less restrictive alternative to more comprehensive regulations of speech. So weren't those campaign finance regulations that you were talking about dealing primarily with the imposition of regulatory burdens upon participants, direct participants in the electoral process, the most obvious direct participants being the candidates themselves and individual and super PAC contributors? Here we have a difference, not just in kind but in concept, because the regulatory burden is being imposed upon neutral third parties who are not themselves participants in the electoral process. That's correct, Your Honor. In Citizens United and Buckley, that was indeed the pattern. What I'm asking you is, isn't that a significant leap? Well, both the Supreme Court and this court have actually applied a Buckley-type analysis to even to third parties. The McConnell v. FEC case is an example of that. Now, McConnell in part involved a challenge to disclosure regulations imposed on broadcasters who run political ads. Now, the court did not expressly identify the standard of scrutiny that it was applying, but the district court held below that exacting scrutiny Buckley's exacting scrutiny test applied. Both the broadcaster and McConnell appellees in that case argued that exacting scrutiny should apply to invalidate the law as it were, and Chief Justice Rehnquist in dissent emphasized that exacting scrutiny should apply to that regulation. All of those actors in that case acknowledged that the Supreme Court's well-accepted standard at that point for evaluating campaign finance disclosure requirements, even when third parties were called on to make disclosures, was exacting scrutiny. The Doe v. Reed case is another example where disclosure obligations were imposed on a party that did not fall neatly within the fact pattern of cases exemplified by the Buckley and Citizens United case. Doe v. Reed involved disclosures that were required of the state of Washington with regard to petition forms that were submitted by advocates on behalf of a constitutional referendum in the state of Washington. I think you're on pretty fair ground with saying exacting scrutiny applies, but that doesn't take you all the way home, does it? Your Honor, no, it doesn't, because as Your Honor is intimating, I believe the district court also found in the alternative that exacting scrutiny was not satisfied in this case. And, Your Honor, we believe that was erroneous for several reasons. Well, the district court held that the state interest did not reflect the seriousness of the actual burden on First Amendment rights, right? Well, the court found a burden on First Amendment rights that focused on the competitive – the risk of disclosing competitive pricing information. That was the extent of the court's finding, the risk of disclosing competitive pricing information and the burden imposed by requiring these publishers to – the burden imposed upon the exercise of their editorial judgment. Well, whether something is intermediate scrutiny or strict scrutiny, in either case, it's heightened scrutiny to burdens imposed upon political speech. And intermediate scrutiny, that's a difficult bar to clear. Exacting scrutiny is – I mean, strict scrutiny is an impossible bar to clear. Intermediate scrutiny is still a substantial bar to clear. In either case, it's not a deferential bar to clear. And I guess part of the problem I have is that I don't understand what limiting principle there is once we breach the line and say that burdens can be imposed – disclosure requirements, particularly on the Internet, where space doesn't seem to be much of a limitation. And the disclosure requirement here may seem to be relatively innocuous. But what is to prevent more extensive disclosure requirements in some other state? For example, to disclose all the corporate offices or to disclose the members of the board or to disclose what ads related to the campaign the publications have accepted and what they've turned down. And in other words, it could be a rather extensive list. And isn't that a concern? Your Honor, I think the premise of your question answers it. And that's when Your Honor asks that in this case it may seem – the burdens may seem relatively innocuous. They may seem relatively innocuous. Well, what limits it going forward in the next case are the specific burdens that get imposed in that next case, and an analysis as to whether those burdens realistically impede First Amendment rights. And in this case, Your Honor – Excuse me, Judge Montauk. No, no, no. I just wanted to sort of look at the other side, and that is the state interest. And I wasn't really sure how this furthered state interest. So maybe you can – I mean, I just didn't know how effective this was going to be. How does it address foreign interference in elections? Well, Your Honor, I think it furthers three state interests. It furthers state interest in providing information to the electorate about who's spending money on behalf of candidates in political elections. That's a state interest that's well accepted. But couldn't the foreign operative just withhold the information or give false information? I mean, I just don't know how this gets at the root of that problem. Sure. And I apologize, Your Honor. I was referring to a different interest. There is the interest also of trying to limit foreign involvement in Maryland elections. And to answer that specific question, Your Honor, certainly if a foreign actor tries to evade the requirements of the statute, under the statute, the person placing a qualifying ad is required to give notice to the publisher that they're placing an ad that is subject to the regulations of the statute. If a foreign malicious actor who wants to do bad things fails to give that notice in an attempt to evade the ad's requirements, what's going to happen is there is going to be on the website a conspicuous absence of the information required to be disclosed. In other words, a viewer, a visitor to the website would see the ad and would not find corresponding information about the ad, the information that the online platform would have otherwise been required to disclose. But they still have the ad, right? Well, you still have the ad, but then the statute provides regulatory mechanisms for the State Board of Elections and or the Attorney General. To go after the foreign actor. To go after, well, to have the ad. The idea is to represent that Board of Elections. To have the ad removed. The foreign actor is largely going to be, if it's a foreign actor, there's only so much the State of Maryland is going to be able to do. Indeed. What we can do, what the State of Maryland is trying to do is to stop the influencing by foreign actors of Maryland's elections. But you're trying to stop it with a regulation of political speech, which is the core of our democracy. And here the speech that is most treasured in our democracy is singled out for rather unique burdens. And it seems to turn the First Amendment on its head because the content-based regulation of political speech has always been disfavored. And here you're saying, well, we should allow it. And by requiring these disclosures, don't we run some risk of turning the publishers into the mouthpiece of the state? You said you might think that these are innocuous impositions, but I don't, again, see the limiting principle. And I wonder, the danger with compelled speech, which the Supreme Court has been very sensitive about, is that you turn the regulated party into a mouthpiece for the state. And that is a very significant step to take in terms of granting the State of Maryland or any state authority over political speech. And I just wonder whether we want political speech restricted to that extent. It seems to me this is a very significant leap. I want to go back before you answer that question. I want you to answer it. I don't think that these parties are characterized properly by referring to them as neutral. They have chosen to accept political advertisements. Is that correct? That's correct. They've chosen to accept those other than neutral. Among the advertisements that they run, they've chosen to accept political advertisements. And in that sense, there is an argument that they are participating in the marketplace for the political speech marketplace. In a way, they're trying to have it both ways. They're suggesting that they're just these innocuous third parties and that they shouldn't be required to comply with disclosure obligations when they're not the ones doing the speaking. But at the same time, they're complaining that their editorial judgments and independence is being compromised by these regulations that are imposed on them. And I think they can't have it both ways. But to get to Judge Wilkinson, your point about compelled speech and content-based regulation, all campaign finance disclosure requirements are content-based. It's all geared towards if you're going to speak on these particular subjects in this particular manner and you're going to spend money for that, you need to make these certain disclosures. And so I don't believe that this is the leak that your Honor is concerned about because it's already the kind of regulation that's imposed on other third parties like broadcasters, like radio broadcasters, like cable TV. In fact, this court, in the Adventure Communications case from 1999 that we cite in our brief, Adventure Communications versus the Kentucky Registry of Elections, the courts found that under any level of scrutiny, obligations of broadcasters to submit to Kentucky's regulator the same file that they submit to the FTC containing the political disclosures were satisfied. Why would the publishers compromise their position under the First Amendment by deciding to accept political ads? I mean, that's one of the things that they do. They play a role in the dissemination of political information which may help the electorate make a wise choice. And when you go into Supreme Court decisions like Turnello, they say that you have all kinds of participants in the electoral process, that you have participants who are highly engaged and highly partisan, but certain media are different in kind. And we want them to be exercising editorial judgments with respect to ads and with respect to content and with respect to all kinds of things without compromising their position under the First Amendment. I mean, they have a right to disseminate information to the electorate from a non-participating organ without compromising their own First Amendment rights. Your Honor, we agree with their right to disseminate under the First Amendment this kind of information. But we think this case is just like the FTC versus – I can't remember the name of the defendant, but it's the D.C. Circuit case from 1988 where the court upheld requirements imposed by the FTC that when a news magazine that covers the securities industry receives consideration for something that it publishes from an entity in the industry that it's covering, it should disclose the fact that it is receiving consideration for that. This is the same situation. These plaintiffs are receiving consideration. They're getting paid to run these ads. And their right under the First Amendment is not compromised by requiring them to disclose two lines of information about who's doing the paying. Your Honor, my time is up, and I'm happy to answer additional questions. Well, I do have one additional question, and that is we haven't given as much attention to the inspection requirements in this act. And the publishers here are required to keep rather extensive records. And the possibility then exists that agents of the state are going to be coming in and examining those records in some detail for compliance with the statute. And my question is, doesn't the inspection requirement bring the state and the publishers into an unhealthy entanglement? I think that the complete separation, of course, between the news entities and the state is probably impossible. But there comes a point where entanglement is something to be concerned about. And that is particularly true where the Attorney General is saying, I have the authority to go into court and get a court order taking down the ad. And by the way, if the court order is violating, I have the discretion to initiate a criminal prosecution. And so how can that help but exert a chilling effect upon speech when you give the state the authority with both civil and criminal sanctions to supervise this whole area? It brings the state and the press into closer contact than I think the founders might have wished. They wanted a degree of separation not just between church and state, but between press and state. And that's essential to the health of our democracy. And when you insinuate the state too much into the operations of the press, you begin to corrode public trust in the state. That's so often what separates a free society from a totalitarian society is that people understand the media is not a state-run media. In North Korea, it's a state-run media. Here, it's not. You see my concern, friend? I understand, Your Honor, and I understand your concerns, and they're valid concerns. In this case, we have a situation where there are requirements that are imposed on broadcasters, including news broadcasters. But broadcasters have always been more regulated because of scarcity, reasons of scarcity, than the defendants here. That's true of the airwaves, but it's not true of cable and satellite. There is no scarcity over the cable networks, and they're subject to very similar disclosure obligations because the courts recognize the public interest in information, disclosure of information about who is funding political speech in or around elections. And with regard to the inspection issue that Your Honor is rightly concerned about, in this case, the information that is required to be retained is all information that's provided by purchasers. And provided by the people who are putting ads. The plaintiffs themselves say the state should go get that information from the purchasers. They shouldn't come to us. But we think that, Your Honor, the state of Maryland has, in its legislative judgment, determined that a better locus for that, a more effective locus for the ad, for being able to obtain that information about ads, is in the publishers and not the purchasers. And I think it's the state's prerogative to exercise that discretion. Is there anything further? It's an important case, and I want to make sure you had a chance to say everything you want to say. No, Your Honor. I think, actually, the tenant case that this court decided several years ago, I think, is, I think, instructive to this court. And the reason is, although that court found exacting scrutiny wasn't decided in that case, it recognized that the state could legislate an area, even when there's a, even anticipating a problem. In that case, there was, the court found that the statute at issue was under-inclusive, impermissibly under-inclusive, because it regulated print periodicals, advertisements in print periodicals, but didn't extend to other advertisements like billboards or direct mailers. The court found it was under-inclusive and found that it violated exacting scrutiny because the state had no reason for it being under-inclusive. Can I ask you one question about some of the Supreme Court precedents? Yes, Your Honor. Tornello, which was the Florida right to reply case, and then Hurley, which was the parade case, seemed to indicate that the independence of editorial judgment applied to not just questions of opinion, but to matters of fact and to questions of advertising as well. And so those are two significant Supreme Court precedents, which appear, at least in my reading, to say that there is a, indicate that there is a broad scope to editorial judgment, and that it does extend not, that it does extend to advertising and to fact. And I'd like to hear your response with respect to those cases and why you think they may not be applicable. Your Honor, if, I guess my response to something like Tornello would be under both the Tornello case and the SEC versus Wall Street Publishing Institute case I cited earlier, and that's 851 F. 2nd 365. If a publisher decided to run an editorial only because it was being paid to run that editorial about political issues, about anything they wanted, I think the state could reasonably require disclosure of a notice that it was being paid to do that. And so I think what we have here are advertisements, which are by the nature of being, the publisher's being paid to run them. Well, the Supreme Court was aware of that very fact, and yet it's said in the opinions that the editorial judgment even ran to advertisements of that nature being paid. So how do you address that? Well, I guess, Your Honor, it's the question of what's being asked to be disclosed here. It's just information about the advertisement that editorially and in their judgment they have already decided to run. It's information about who paid for the editorial or for the advertisements and how much they paid for it. And that's the extent of it. Okay, well, let me ask you a question that Justice Souter always asks people. You probably have heard this. But sort of how does this write, then? Because if we went your way, how would we square it with what the Supreme Court has said in those other cases about advertisements? Your Honor? And their protection. You would square it by likening the disclosure obligations here to disclosure obligations that have been long upheld by the Supreme Court and, indeed, this Court in the campaign finance realm. And it provides, I think, a very suitable way to distinguish it from cases like Tornillo, which I think on its face, too, involves providing an actor in the political sphere a right to editorially reply to an opinion expressed previously in a newspaper. And I think that's just fundamentally a different question than what we have here. Would we be saying, oh, and by the way, your editorial discretion doesn't apply when it comes to political speech, of all things? Which is, in fact, the very thing you might think that an editorial discretion would apply to is something as central to the functioning of our democracy as political speech. And to say that the editorial discretion doesn't apply to a formal political speech, isn't that a significant step? I mean, I appreciate the dialogue, but I would like answers to these questions. Your Honor, I'm afraid maybe we're at a point where it's going to be hard for you and I to convince each other. But I think the editorial discretion of the publishers, the state of Maryland does not intend to interfere with that. They can choose to run these ads. They can choose not to run these ads. The issue is, if they decide in their discretion to run certain political ads, they just need to include a disclosure about who paid for the ad and for how much. Didn't the Carroll County Times cease to run the political ads because the political ads came with a burden that other ads didn't? In other words, if political speech is uniquely disfavored and you have to accept a burden with respect to political speech that you don't have to accept with other ads that would be equally, if not more, remunerative, wouldn't papers and especially smaller papers say, well, look, I'm not going to court all these regulatory requirements and inspection requirements and the rest. I'm just going to cease running political ads and start running the kind of ads that don't come along with this kind of law. And then, isn't there a diminution of the political speech that reaches the electorate? And wouldn't that raise an eyebrow or two at the Supreme Court? Your Honor, if a handful of newspapers were to make that determination, and we in our papers, I don't want to belabor this. I'm already well over my time. And I don't want to take the floor. That's all right. It's our fault. It's my fault. Well, we don't agree that the burden is as oppressive as the plaintiff suggested. Is there anything in this record about anybody being burdened? I mean, any evidence? In the record itself, there are declarations submitted by the representatives of some of the plaintiff's properties that basically purport to identify the reasons for why it would be burdensome. In our papers, we explain why we don't think those should be credited. We think that this report was wrong to credit them. We don't think, for instance, that there is a competitive risk of disclosing pricing information imposed by these disclosure obligations because they're only required to disclose the amount paid. And the amount paid is not something that tells you how much something costs. Do we have any evidence that foreign operatives actually ran these kinds of political ads in these papers that would be governed by this regulation? There's evidence that foreign operatives used ad networks. Yes. And the same ad networks also placed ads on the plaintiff's properties. But there's no direct evidence that foreign ads ran on one of the plaintiff's properties. And I have another quick question. Yes, Your Honor. Has this statute been copied in other states or did the Maryland statute copy in other states? Is there some movement? I can't speak to the drafting process in Maryland as to what they used to put the act together. And you don't know of other states that have similar statutes? There are other states that are regulating in this area. New York State has a—I don't know what state's legislation is. But you don't know how close it is to this statute? You don't know how close it is to this statute? There are some differences that the plaintiffs have identified between the New York effort and Maryland's efforts. I know Washington has also moved in this space. And the federal—I think the House of Representatives has passed the Honest Ads Act, which is something that attempts to address similar issues at the federal level. And these two would be subject to some of the same concerns, Judge Wilkinson, that you've raised about constitutionality and compelling speech and so on. Well, I want to say that I appreciate your argument very much and you've reserved some time for rebuttal. Thank you, Your Honor. Mr. Berlin. Mr. Berlin, one thing I want to ask you is whether there is a First Amendment interest on both sides of this case, because dark money is a concern in the political process and, you know, disclosure is a disinfectant and it's sunshine. And do we not add to the fund of public information with disclosure requirements? Do we not enhance the electorate's ability to make an informed judgment the more we know about the provenance of advertisements? Well, that's addressed in this statute in really two ways that don't involve platforms like my clients. So the first is that in the ad itself—and this has been one of the things that this statute did, was make clear that this applied to online ads— is that in the ad itself, it has to say who the ad comes from, right? It has an authority line. And that's a separate requirement of the statute. So that interest is served by the statute without bothering newspapers and their websites and other platforms. And the second is that participants in the political process—campaigns, donors, those making independent expenditures— have to disclose their expenditures to the State Board of Elections, which has a very robust website. There are about 30 pages from that website which we use as demonstrators. But people don't always go to another website to get information. It's always best if the information comes packaged together. Well, it's not packaged together under this statute, right? So this statute doesn't require— There's a 48-hour requirement? Well, A, there's a 48-hour time lag. And B, it does not require anywhere in the statute that what the newspaper or website is supposed to say about the ad has to be with the ad. It simply says it has to be on the website. Let's suppose there was such a requirement that the disclosure be with the ad. Would that resolve your objections? Well, that would resolve just that piece of it. In other words, that would actually do what Your Honor is suggesting, which this statute doesn't do. But if it did that, it is essentially duplicating a requirement that the ad have in its text, the authority line, as opposed to some separate thing that's in your hypothetical somewhat more adjacent to the ad. But that right there is one of the reasons why this act doesn't satisfy either level of scrutiny because it's one of the statements— But in other words, Maryland's campaign finance law can require the complete package from the participant. From the participant. That's exactly right. So it's getting this information. So the things that it wants to come and inspect us for, it has that information and it publishes that information. And it's easy to use. So are you saying the public can get the same information by traditional campaign finance regulation? If you took the perception of the statute that pertains to online platforms out of the statute, or you didn't make it applicable to traditional websites, put aside Facebook and Twitter for a second, where there was a problem as opposed to newspapers and other websites. I'm talking about just these defendants because I think this is an as-applied case. Agreed. But you're saying that the same information can reach the public by having the burden imposed not upon a neutral third party, but upon the purchaser rather than the publisher of the ad. Right. In two ways. One is we're going to put in the ad who paid for the ad. This ad comes from— I thought your representation was that's already under—it's already there. That's already there in another section of the statute, right? So I'm sorry if I misunderstood. So is your argument that this thing is redundant? It is. But that's not a constitutional challenge. You're saying that they're already giving up the—I don't get—there's no additional information. It's just where it comes from that is different. Is that what you're saying? No, that's—I'm sorry. I think we're having a misunderstanding. Yes, a failure to communicate, as Paul Newman said. So the statute, without the section that deals with online platforms, already requires the political advertiser, if they place an ad, to put in the body of the ad who paid for the ad. Right. Right. So making the website publish again in some other location, that same information is duplicative. Right? Number one. Number two, the other way that the public gets that information is that the campaign or other political speaker is required already, again, separate from the section that's at issue here, to report that information directly to the State Board of Elections to put it on the State Board's website. So the public gets that information in two other ways. One is in the body of the ad, and the second is from the State Board of Elections website. The state is basically saying, we want to co-opt other parts of the newspaper's website to basically do that a third way, which is, in fact, belts and suspenders. You have to have some reasonable fit, and whether it's exacting scrutiny, and certainly you have to have the best fit if it's strict scrutiny, and either way, if you are, well, let me put it to you this way, as I think the Third Circuit put it in the ACLU versus McKenzie case, if you are doing both belts and suspenders, if you go to your tailor, and what comes back requires both a belt and suspenders, you don't have that narrow tailor. You have something that is far afield from that. And that's just speaking to the transparency piece of... So Mr. Trento has articulated essentially two aims of the statute. One is we have to give additional information to voters, which is what I think your Honor and Judge Wilkinson were getting at, which is the right to receive information if you are a voter. And the second, and Judge Mott, you asked about the effectiveness of this, is an interest in police and washing interference. And there you have a complete mismatch in the statute. You have a statute that... You have a problem that basically came from unpaid posts, and you have a statute that regulates paid posts. You have a problem that was concentrated in social media platforms like Facebook and Twitter, and here you have a statute that regulates all websites, big and small. And I hear you on that argument, but there's really no reason why the government could look at the past problems and anticipate what future problems might be and try to deal with those problems. Do you understand what I mean? In other words, we don't know who's going to be coming at us in what way in the next election. But again, then what does the statute do? But I was just addressing your last argument. The rest of it is, if you are a nefarious foreign actor and you decide that instead of going after Facebook about a national election, you want to go after the Eastern Star Democrat about the Calvert County election, which is sort of to pick up on your hypothetical, even assuming that's true, this statute, which requires the newspaper essentially to take what they... First of all, it requires the foreign actor, the political speaker, to report themselves and to self-identify. Well, what, and this is what Judge Grimm found, what would be a foreign operative that wants to hide themselves? Well, that's a question I asked your colleague. It doesn't get you anywhere. What it does is essentially, as a result, burden a whole bunch of legitimate political speakers and because they can't get access to political advertising in favor of trying to police somebody that's not going to disclose themselves anyway. If we can go back just for one minute to the argument that you were making that this is all basically duplicative, that there are other places. But isn't there a time issue? You get it more, you get it. If you file with the State Board of Elections, usually there are times you have a certain number of days, hours, months, I don't know, to file and maybe on the website. Is there a difference in, remember Judge Wilkinson was asking your colleague about having it all in one parcel. Is that the difference? I mean, is that a difference? It is under the current regime, but there's no reason why if the state is going to require the political speaker to disclose it promptly to the website, that they can't similarly require the political speaker to disclose it promptly to the State Board of Elections. And if you're looking for what is the justification for intruding... But your whole argument is not the nature of the burden so much as on whom the particular burden is imposed. It's not what burden is imposed, what regulatory burden is imposed, but on whom it may be constitutionally imposed. It's really both, but it's the latter that's the principal thrust. Right, but you wandered into the former when talking about you had all these other ways to do the same thing. But, you know, as I understand it, the gist and thrust of your objection is not so much that these particular requirements are unduly onerous, it's the fact of to whom, on whom they are applied that opens up a whole new gateway of regulation that is potentially very destructive to First Amendment process. Is that right? It's really... I hate to give the lawyer's answer, but the answer is both. Right, so the harm of this, and the declarations in the record on this are uncontroversial. You're saying it's intrinsically burdensome. I'm saying it's intrinsically burdensome because it crosses a line, but I'm also saying it's practically burdensome because we have a bunch of uncontroverted declarations in the record that say this is very expensive to implement, and especially for the smaller papers, if we have to implement it, we will have no choice but to stop taking political advertising. And we have then a declaration from a political candidate who says, when Google, which is a very large company, made that same determination, that this was too burdensome to comply with, and simply said, we will no longer accept political advertising in America, he was then unable to get political online advertisements for his campaign, which is a particular problem for a person challenging an incumbent, as he was. Right, so this is... We have a record which is uncontroverted, which demonstrates both a practical harm and also a constitutional harm. So that's... I don't want to... You know, Mr. Trenchill has come and said, this is essentially an innocuous set of requirements, really not going to cost anybody anything. This is, as a practical matter, and the record on this is uncontroverted, and it was certainly... There's certainly not clear error, which on that factual question is the standard for review. This... There is a substantial amount of harm, and, you know, I'm not just here... Not because there is a constitutional line that we are crossing that shall not be crossed, but because I have clients that, as a practical matter, are saying, if we have to do this, we are really stuck, because it is very expensive to comply with, and that's what the record shows. So I don't want to diminish the actual sort of practical harm here. The practical harm, such as it is, seems to me to be a comparative one, in the sense that it makes political advertising more burdensome than any other kind. Yeah, and that's exactly the lesson of a case like Reid v. Al Gilbert, which says, look, if we're going to single out a topic, and as Your Honor pointed out to Mr. Trenchill, if we're going to single out a topic, and the topic is political speech, and we're going to burden that speech, that's a problem. And it's a real problem on this record, which is to say, you have Google already saying, this regulation has caused us to stop taking political advertising, and you have a political candidate saying, that caused me harm in getting my message out. That's exactly what this is, the First Amendment doctrine that underlies this area is supposed to prevent from happening. Can we talk about the inspection requirement for a moment? Sure, and then I'd like to do that, and then I'd like to come back to Judge Wilkinson's question. Oh, I'm sorry. You know you know nothing about all means. I'm interested in this too, so I'd like you to respond to Judge Monson's question. It doesn't compel any publication, right? Correct. So, the First Amendment problem with it? You are, as I think you made this point, Judge Wilkinson, to Mr. Trenchill, you are putting conditions, and a series of conditions that come as a package, on taking a political ad. One is that you have to publish, one is that you are subject to elaborate inspections, one is that you may be subject to injunctions, taking down speech, and all of these things operate together to burden that ad. And so, if the consequence of that is that drives up the market for political advertising because the platforms will no longer accept it, that is a First Amendment problem. It's a little remote, but I hear you. Right. I mean, and that's what this is. And I didn't really, there wasn't much argument by either party, at least I ascertained, about the inspection requirement. Right. And as a matter of expense, that part is actually the most complicated about this statute because it requires gathering a bunch of data that they don't otherwise gather together. So, you know... You know, maybe that's right, but in the world that we live in with the Internet, everything seems to be instantly gettable if you have the right tool to get it, right? Right. I mean, so... I think that's a problem for the state to come and say, buy a really expensive piece of software so you can do that instantly. Well, I think the inexpensive piece of software that I have in my office might be able to do it. Go ahead. So, but the problem with the inspection requirement, in addition, I just want to make one other point, which is not a ground that the district court reached, is that it also is a Fourth Amendment problem under City of Los Angeles v. Patel, and I just want to put that issue. I want to come back to the constitutional problem because we talked some about practical harm, but the constitutional problem here is this. This is done against a backdrop of basically three bedrock First Amendment principles. One is we don't like compelled speech. Two is that this is core political speech that's being burdened. And three is that this is a content-based regulation. And all three of those would subject this to the highest level of First Amendment scrutiny and would treat that as presumptively unconstitutional. So what the state is saying in response is, essentially, pay no attention to all of that. Look at the Supreme Court's and this court's cases that deal with whether there's a political speaker where we apply exacting scrutiny. And that really doesn't, that really should not be extended here because you have a line, essentially, that is being crossed, and we have a bunch of reasons why not. So first is we have a long line of Supreme Court cases in recent times that say we don't expand willy-nilly the categories of speech that are subject to additional regulation. Cases ranging from United States v. Stevens to Brown v. Entertainment Merchants Association to United States v. Alvarez. Then we get to Reed and to the National Institute of Family and Life Advocates cases where the Supreme Court is cautioning expanding these categories more broadly. So that's the first thing. And Judge Grimm, I think, appropriately, in the district court, recognized that we do have competing lines of authority and the question is, this is sort of unique and doesn't really fit comfortably into the other exacting scrutiny cases that dealt with direct participants in the campaign process and looked at these other cases and said that's a reason for not expanding that category. The second is that the court does treat third parties differently, right? We have other cases where the court is talking about what happens to something that's like a platform, right? So this court in Cahill talks about a service that you can contract with to do robocalls and they challenged it and said, look, there's a regulation that says we can't do political robocalls and the court said that's subject to strict scrutiny because, right, so you have a robocall company. In Reed, you have the court talking about sound trucks and the court says a law banning the use of sound trucks for political speech and only political speech would be a content-based regulation subject to strict scrutiny. You have the Dry House case from the Sixth Circuit in which they're talking about billboard companies and you have all of these examples. Even in Brown v. Entertainment Merchants Association which was a case about telling violent video games to minors, the court says, we note our doubt that punishing third parties for conveying protected speech is a proper meaning of aiding and abetting, in that case, parental authority. That was the state interest that was articulated. So we do actually have a long line of precedence that recognizes the line I think that Your Honor, Judge Wilkinson was trying to articulate for Mr. Trento in which you have a line between these people who are actually direct participants and independent third parties. Here in the press, but it could be we represent a bunch of newspaper websites but it could be a different website, right? And third, the rationale doesn't hold up. The rationale for allowing exacting scrutiny, which is a high but somewhat lower than strict scrutiny form of scrutiny to apply to this case is that and Mr. Trento actually agrees with this because he said it in his opening argument that in Citizens United what the court says is essentially we'll let you spend what you want as long as you tell us who you are. And it ties those two things together. And it says that disclosure is the less restrictive alternative to a limitation on spending. When you move outside and you get to a third party like in this case a newspaper website, the newspaper website isn't making the decision about whether to speak or not in the same way that a political candidate is who might be tagged with having to disclose who they are or a campaign or attack. They're making a different decision which is if you burden this speech with a bunch of regulations and inspection requirements and injunctions and so forth I'm going to pass on that speech  for automobiles and washing machines. And then the candidate is not left to decide for themselves whether to speak. So the rationale that allows for exacting scrutiny to be the form of scrutiny for a candidate or a PAC or a contributor doesn't carry over into a realm where you have a neutral third party like a newspaper. And so for all of those reasons that's why we think that this case is properly judged by strict scrutiny. And if we should conclude otherwise you lose? No, I think the judge, I mean the whole premise of the first part of my argument was that in fact I think there's an interesting philosophical legal issue in this case which is does exacting scrutiny I'm not sure that we need to pass on that because nobody is contending that this is deferential scrutiny and whether it's exacting scrutiny and the term is used imprecisely and interchangeably to a whole variety of levels but whether it's strict scrutiny intermediate scrutiny or this umbrella term exacting scrutiny there can be no question that it's heightened scrutiny. It's got to be at least that as I indicated earlier the difference between the levels of scrutiny is between the difficult and the impossible. And so it's a law such as this one has absolutely got to draw and warrant the scrutiny of the courts. I can't our democracy depends upon a variety of voices and some of those voices are strictly partisan and others are independent carriers or independent vehicles of political information but what you want is information coming to the electorate from a variety of sources with a variety of different characteristics and in a variety of postures and that all that in the mix helps to create the foundation for an informed electoral decision when you compromise any of those organs that contribute to information in our election by changing its nature or by bringing the state into closer contact with them you begin to distort democratic process. At least that is what I think is a danger. My time has expired but if you'd like I would like to try and address that and answer If you have anything you want to say you could I just want to say I agree with the point your honor just made and to answer Judge Mata's question I think there is an interesting philosophical issue about whether it should be exacting scrutiny or strict scrutiny in this case and the district court did grapple with that issue I don't disagree with you that you could decide this case without resolving that question and the reason I say that is because as I said in the first part of my argument this statute fails either level of scrutiny because there is a complete mismatch as the district court found based on a bunch of evidence that we put forward in the district court that was not controverted By not deciding the exact level of scrutiny I think Judge Mata pointed out something that was very valuable and that is we don't know what the future will bring and suppose we don't know in the future what foreign entities are going to infiltrate where and so it's just as good as a general rule not to write too sweepingly and too broadly in a way that will try to forecast future developments and future threats to the integrity of our democratic system I mean that's what it's all about is preserving the integrity of democracy and identifying the threats to that integrity and the threat to that integrity can come from impingements on the freedom of the press but the threat to that integrity can also come from what has raised concerns about recent elections and that is foreign infiltrations into various platforms and social media platforms or others but we don't know and we see through a crystal ball darkly and so it's good not to just write in a way that hamstrings the ability of future courts to safeguard the integrity of the system that we have that's what it's about If I might just speak to that briefly So we gave everybody lots of time but then again Daniel Webster took 19 hours in the Dartmouth College case I thought it was several days I mean there were spread hours I stand corrected I think Mr. French and I will both try and beat that record so we'll stipulate to that Which way? I just want to I'm comparing both of you to Daniel Webster not just one Well let me just say really two things We had this discussion at the district court about essentially this If you think that you're going to win either way under exacting scrutiny or strict scrutiny why are you spending so much energy arguing for strict scrutiny and let me answer that because I think it's important I'm here on behalf of a group of newspapers and we feel very strongly that the protections that newspapers enjoy for what they publish and what they don't publish ought to be judged by the highest level of scrutiny in our constitutional constellation So that's why I'm arguing it But you heard what Judge Wilkinson I thought he kind of did an amazing job of getting together the various reasons why we don't have to decide that question And I'm going to come to the second piece of that which is I'm sorry for not getting there quickly enough But the second piece of that is this which is that's why we're arguing it But you could decide the case under either and I think we should prevail But what I want to say about the threats My clients have published for 100, 150, in some cases more than 200 years and they have done so They have seen the government over time claiming the need to regulate based on some perceived threat They've gone through two world wars Cold War Labor movement Civil rights movement National security concerns following September 11 And there's always some reason that the government is articulating that says we need to abridge the freedom of the press and freedom of speech And usually when we look back on that we say that that threat was overstated and unnecessary And this, in my judgment, is just and in our judgment, is just another one of those things because this statute does not do If this statute had been in place in 2016 it would not have done anything to detect foreign interference that we're talking about in our election And that's true at the national level if you talk about ads in the Washington Post about national political candidates And it's certainly true if you talk about ads in the Eastern Star Democrat which has been doing its work since 1799 where there has been no evidence that some foreign government tried to interfere with it by dealing with national let alone state or local elections And given all of that we think that the judgment the injunction order of the district court ought to be affirmed And unless there's any other questions I will Judge Floyd, do you have any? We have no further questions Thank you very much Mr. Trento, come on and you have some rebuttal time Thank you, your honor Several points I think this issue about Judge Wilkinson, that you were raising that we should wait until the problem manifests before the legislature acts or before the court decides what the legislature can do It was in the Tennant case actually that this court said  in this exacting scrutiny realm The court held that the legislature was entitled to anticipate that advertisers might otherwise shift to newspaper or periodical outlets to avoid reporting obligations and so when the legislature imposed reporting obligations also onto those periodicals, the court held that that was sufficient even if, up until that point But doesn't the requirement of heightened scrutiny be it intermediate scrutiny or strict scrutiny require that the state demonstrate tangible harms before an infringement of First Amendment freedoms is permitted There may be a limit to the ability of the state to act prophylactically on the basis of speculative harms because that opens the door to a wide variety of regulation but this whole requirement that there be either a substantial state interest or compelling state interest depending upon the tier of scrutiny at least at least those two tiers of scrutiny require the identification of tangible harms before the freedom of publication is curtailed That's what I'm saying to you I'm not sure the district court didn't find any evidence and it's as far as I can see the harms of infiltration will more likely be unpaid ads on social media rather than paid advertisements in particular publications of the defendants here I don't understand, for example, why somebody would be infiltrating the Carroll County Times or what have you There has to be something tangible and concrete to justify curtailing this freedom, don't you think? I agree, Your Honor and in this case the exacting scrutiny test requires an important or substantial government interest and it requires a fit between the burden imposed the burden imposed can't be so great when compared to the interest and in this case there are several interests the foreign infiltration is one that I know the plaintiffs focused on, the district court certainly focused on, but under the exacting scrutiny test the mere provision of information to the electorate in a way that reflects the changing political advertising landscape things for some time now have been moving online and this law provides even readers of the Carroll County Times a place to see the ads that are run in the Carroll County Times at least the ads that are directly placed in the Carroll County Times and to understand who's paying for them Well, on that point, can I I'm sorry to interrupt, but your colleague spent a fair amount of time talking about this is all redundant the public can find this information out easily otherwise what do you have to say about that? Well, several things. First of all, it's not redundant just as a matter of what's currently required to be disclosed I think he was saying other provisions of the statute so the authority line I think is what he was referring to each ad has an authority line that identifies the treasurer of the committee that sponsors the ad what the disclosure obligations imposed by the statute do is they add several bits of information to that. The first is they tell you how much is being paid for each individual ad you don't necessarily get that even from campaign finance much less on the face of the ad So it's not just a timing thing I thought the problem was that you weren't getting all this information in a timely manner, but you're just not getting some of it The timing is certainly one component of it but it's also a substantive the information isn't always there the other disclosure about the identity of the person paying for the ad is if it's not a political committee the disclosure needs to include who purchased the ad and any persons who are controlling that person. So if there's a board of directors of an organization that's not a political committee that has spent money on the ad the purchaser is required to make that disclosure to the publisher and the publisher is then required to include that in the disclosure that it runs on the online platform. So that itself too is something that is not currently embodied by the statute Doesn't that give you another problem? You mean if you have a board of directors you have to lose all the directors? Well I couldn't say, maybe a board of directors is an example. It's just the persons with decision making control over the purchase over the individual making the purchase and so what that does is it sheds light on if there is an individual purchasing the ad if there's somebody behind that individual who is funding the effort making the decisions for the organization that the individual on behalf of which is purchasing then the public should be entitled to see that and that's something that this statute again tries to shed light on But couldn't you get so much of what you want to get by we come back in a sense to where we started and couldn't you get so much of what you want to get by regulating the participants in the political process directly? That's what we're doing here your honor. We are this gets to the point that my colleague made about the burden he says these declarations are uncontroverted in regards to the burden software, they have to collect all this information they don't normally collect the statute requires all of the information both that they're required to disclose and retain, the statute requires the purchaser to provide that information it's not something that they need to independently collect. It comes from the purchaser so uncontroverted factually, yes there's a burden on somebody but not on these people the burden is on the people who are intending to speak about political issues what we're requiring is that the consumer benefits by being able to see that on the online platforms, on the websites the burden this is a requirement on what the publishers do and the civil sanctions are applied not to the purchaser but to the publisher and the criminal sanctions are applied not to the purchaser but the publisher so the requirement of the ad apply to the publishers and not the purchasers and the civil and criminal sanctions also apply to the publishers and not the purchasers so it honestly seems to me that contrary to what you're saying that the burden here is simply not on the purchasers of the ads it's falling directly on the publishers and the sanctions for violating the burden that's imposed directly on the publishers well I believe you're right the burden also falls on the purchasers because they would also be subject for purchasers that don't comply with the ad they would also be subject to the penalty well the fact that they would both be in the dock themselves doesn't make it any less for the publisher I think that your argument is sort of a factual matter about getting this information together you're quite right it's not the publishers but there still is some obligations because of the statute and some liabilities Church-Wilkinson says on them, right? there is some liability on them if an ad is run and again they can rely on good faith on the information provided by the purchasers if an ad is run that for whatever reason isn't complying with the requirements of the statute the attorney general has authority to seek injunctive relief what would probably happen is we'd say hey washingtonpost.com you've got an ad on there that doesn't comply the attorney general can go into court and get a court order and pull the ad down isn't that threat of the attorney general seeking a court order that would pull the ad down is that not an interference with the burden upon the publisher how can that not and it's the publisher that can be hauled into criminal court for the court order for pulling the ad down these these are burdens on on publishers there may be burdens on purchases too but the fact that there may be burdens on purchases to supply certain information doesn't mean there aren't burdens on publishers to print the information and include the information and face the sanctions for not doing so in other words these are not mutually exclusive burdens it isn't a fact that the burden on one absolves the burden on the other it can be burdensome to both isn't that a fair characterization of the statute I will not stand here and say that there is zero civil burden on the publisher in fairness you were responding to my question about what your colleague said about gathering the information you said to me look it's not on the people that are defendants here Judge Wilkinson makes a fair point about which you are not disagreeing I don't think I'm not going to stand here and say there's zero there's zero burden on the publishers and the publishers have an obligation to produce the information disclose the information that's provided by the purchasers and if they just choose not to then they are subject to a court order from the Attorney General and the court order is to counterman their discretion and pull the hand down well again this is a space we're talking about information disclosure information about who's paying for campaign finance related disclosure information that there's a well established history that the government is free to regulate to a greater extent in this area wouldn't it be fair to say what this is all about is just a virtual record book I suppose that's one way of characterizing it that we're asking them to it doesn't require them to put it on the front page of their website but it does allow somebody who won't see to go in and look and see who paid for that that's right and I think your honor just getting to the point about you know can't we require candidates, purchasers, whoever just to file all this information with the State Board of Elections I think there's a benefit to having that information around where you see the app now it's true that the statute only requires that the publishers disclose this information on the internet but what we have in the record we showed instances where Facebook what it does to comply with Maryland and other obligations what it does is actually provide you can hover over an ad and it pops up a window and take you right to a page that shows all these metrics and I don't beyond what the statute requires but I think what the state has intended to do is provide, recognize that there's more than one way to do this and to provide the properties like the plaintiffs with some flexibility as to how they disclose this information, how they show it and in theory the marketplace can sort out you know hey there's a good way of doing it look at what this property does and then iteratively moving forward maybe there will be some consensus as to what's the best way to, how best to display this information in a way that isn't burdensome in a way that accomplishes the state's information sharing goals Barb, we thank you Can I just, I'm sorry on this inspection requirement do you see any difference in the strength of your case with respect to the two different requirements do they rise and fall to the same extent Well there's a, there are different theories different First Amendment theories play in this case there's a compelled speech theory that the plaintiffs articulated and there's a a content-based regulation theory that the plaintiffs articulated and certainly the record requirements are implicated by their content-based regulation theory, you know they're being required to maintain records again, information that's provided by purchasers but they're being required to keep that information on the basis of the category of speech that we're talking about, political advertisements So I guess the answer is no, you don't see really any It depends on how the court decides the case it depends on what the theory that is most appealing to the court is now, under exacting scrutiny Buckley v. Vallejo, which is the first case that really articulated that, involved both disclosure and record-keeping obligations and the court assessed them all together so it didn't make a distinction between them Thank you We thank you, Mr. Trento We will adjourn court and come down and greet counsel
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Henry F. Floyd